## HART *v.* STATE.

### Opinion delivered January 14, 1924.

1. HOMICIDE—SELF-DEFENSE—INSTRUCTION.—Where, in a murder case, defendant testified that, on the night of the killing, after deceased had abused and threatened to kill him, he left his home with his wife and baby, and afterwards came back, when the killing took place, instructions that, if defendant "went back home for the purpose of having trouble or provoking the difficulty which brought on the trouble that resulted in the killing, then he cannot claim self-defense," *held* inherently erroneous and open to a general objection, as he had a right to return to his home, regardless of his motives, unless he did some act which provoked the difficulty.

2. HOMICIDE—SELF-DEFENSE.—If defendant, by act or conduct, brought on the difficulty at the house which he and deceased rightfully occupied, he could not claim self-defense unless he endeavored in good faith to retire from the difficulty.

3. HOMICIDE—SELF-DEFENSE—INSTRUCTION.—In a murder case defendant testified that there had been an altercation between deceased and himself, in which deceased, while intoxicated, made threats of killing him; that, after carrying his wife and baby to a neighbor's house, a half mile distant, he returned, whereupon deceased renewed the controversy, resulting in his killing deceased. Defendant requested an instruction that, if deceased, "after the return of defendant, attempted in a violent and turbulent manner to enter the room of defendant, the defendant had a right to withdraw therefrom, the better to protect himself from the attempted or apparent assault of deceased, and if, in doing so, defendant honestly believed that it was necessary to shoot deceased to prevent being killed or seriously injured in body, you will acquit defendant." The court modified the instruction by adding: "if he reached such conclusion based upon the actions, demonstrations or conduct of deceased at the time or just prior to the shooting." Held that the modification erred in excluding from consideration the previous conduct of the deceased.

Appeal from Prairie Circuit Court, Northern District; *George W. Clark*, Judge; reversed.

*F. E. Brown* and *Cooper Thweatt*, for appellant.

*J. S. Utley*, Attorney General, *John L. Carter*, Assistant, for appellee.

McCULLOCH, C. J. Appellant was indicted for murder in the first degree by shooting and killing J. H. Tallent, in Prairie County, Arkansas. On the trial of the case appellant admitted the killing of Tallent, as charged, but claimed that he acted in necessary self-defense. The trial jury returned a verdict finding appellant guilty of manslaughter, and he was sentenced to the penitentiary for a term of three years.

The killing occurred about midnight, or a little later, on March 24, 1922, at a house occupied by appellant on a farm owned by Tallent, in Prairie County. Tallent rented the farm to appellant, but reserved two rooms in the dwelling-house for his own use. Appellant had been living on the place about two months at the

time of the killing, and Tallent had occupied his room in the house only on two or three occasions, but he visited the farm two or three times a week. Tallent lived with his family on another farm about six miles distant from the place where the killing occurred.

There were no eye-witnesses to the killing, and no persons were at that house at the time the killing occurred save Tallent and appellant himself. Immediately after the shooting, appellant went over to the home of his father and mother, about a mile distant, and sent his brother and another person back to the house, and those persons found the dead body of Tallent lying on the floor. They went over, a few miles distant, and notified a justice of the peace, who came to the house and found the dead body of Tallent lying on the floor.

The house faced north, and there was a hallway running through the center, and a narrow porch in front, extending about the width of the hall. Appellant, with his wife and baby, lived on the east side of the house, and Tallent's rooms were on the west side of the house. The doors to the rooms opened into the hall. Tallent's body, when found, was lying in his own room, almost face downward, with his head extending under the edge of the bed and his feet back towards the door. Some of the witnesses say his feet extended back to the doorway so that the door could not be closed. A lamp was burning in the room, and there was also a lamp burning in appellant's room across the hall.

There was only one wound in the body, and that was a pistol-shot wound entering just below the cheek bone and ranging downward along the jaw and neck into the heart. There were four other shots fired, which took effect in the walls, and the witnesses testified concerning the location of the marks on the walls and doors. Appellant admitted that he emptied his pistol, and he testified that he was standing on the ground in front of the porch when he fired the shots, and that Tallent was standing in the hall, having just come out of the door of the room occupied by appellant.

The State's theory in the trial of the case was that Tallent was shot while he was lying down, or at least that appellant was standing above Tallent when he fired the shots, and the evidence adduced by the State as to the location and range of the bullet which entered Tallent's face, as well as the location of the bullets which struck the walls of the hall, tended to show that the State's theory was correct, and that appellant was not standing on the ground, as he claimed, when he fired the shots.

Tallent's body, when found, was fully dressed, with his coat unbuttoned, vest partially unbuttoned, top shirt buttoned up to the neck, and with a pistol in a holster under his left arm, between his top shirt and undershirt.

Appellant took the witness stand on his own behalf, and gave his account of the circumstances attending the shooting. His narrative of the events is about as follows: On the night of the killing, Tallent rode up to the house, about eight o'clock or eight-thirty, and went into his room, and a few moments later called to appellant to bring him a lamp. which appellant did, carrying the lamp from his own room over to Tallent's room. Tallent was obviously intoxicated, and had whiskey with him. He had a half-gallon fruit jar with a small amount of whiskey in that, and also a half-gallon of whiskey in a fruit jar in his saddlebags. When appellant went into the room with the lamp, Tallent was sitting in a chair, and offered appellant a drink, which was refused, and Tallent then took a drink himself. Appellant returned to his room, and in a few minutes Tallent called for water, and appellant went back into the room, carrying a bucket of water and a dipper. Appellant sat down on the side of Tallent's bed and they engaged in a conversation, which was started by Tallent demanding that appellant procure wire and posts for the purpose of rebuilding a fence on the place to keep out stock. Appellant declined to do this, claiming that it was not a part of his contract, whereupon Tallent became angry and abusive, and threatened to kill appellant and have inter-

course with appellant's wife, who was then in a room across the hall. Tallent made no effort to carry out his threat at that time, and appellant did not in any way resent the epithets and insults offered by Tallent. After further conversation, appellant got up and started, with the water bucket in his hand, to his own room, when Tallent again stated that he would kill appellant and have intercourse with his wife, using a vulgar term in describing the act of sexual intercourse. Appellant returned to his room, and he and his wife went to bed. In a little while, according to the narrative, Tallent came across the hall to the door, which was fastened by a thumb-bolt, and began knocking on the door and calling out that he was going to kill appellant and have intercourse with his wife. Appellant and his wife then got up and dressed and took the baby and went quietly out of the back door and out through the back part of the premises to the home of appellant's cousin, about half a mile distant. After staying there a few minutes, appellant went back to his home and reentered the house in the manner in which he had left it. He testified that the reason he went back to the house was that the fire-place and hearth were defective and out of repair, that he had left a fire burning there, and was afraid that the fire would roll down and burn the house, and that he went back for the purpose of smothering out the fire. After fixing the fire so that it would not roll down, he went to bed again and dozed off, as he said, and he was awakened by Tallent knocking on his door, and again repeating the threats which he had formerly made that night with respect to killing him and having intercourse with his wife. When appellant laid down on the bed he blew out the light, but he said that when he got up again he lighted the lamp, and immediately went out the back door while Tallent was still knocking on the door which opened out into the hall. After going out of the house he walked around the house to the front, and. while standing on the ground in front of the porch, Tallent came out of appellant's room, and, looking out from the

hall door, saw appellant, and again repeated his threat to kill appellant, and made a demonstration as if to draw his pistol from his bosom. Thereupon appellant began firing, and emptied his pistol. Appellant testified that, after emptying his pistol, he turned and ran around the house again, without knowing whether any of his shots had taken effect or not, and that he hurried on over to the house of his parents to get some one to go back over there and see whether he had killed or wounded Tallent. Appellant testified that his pistol was lying on the top of the dresser in his room, and that he never took it into his hand until he left the house the last time. He stated that he left the pistol lying on the dresser when he accompanied his wife to the home of his kinsman.

Appellant also introduced a witness who testified that he lived about a mile from the place where the killing occurred; that, about sundown on the evening before the killing, Tallent passed his home, riding a horse, and was intoxicated, and, after offering the witness a drink of whiskey, asked the witness if he knew what sort of a woman appellant's wife was, and stated that he was going over there to the house, and intended to kill appellant and have intercourse with his wife.

It is not contended that the evidence is insufficient to sustain the verdict finding appellant guilty of manslaughter. The evidence was, we think, sufficient to sustain the verdict, and all of the assignments of error argued here relate to the court's charge to the jury.

The first ground urged for reversal of the judgment is that the court erred in giving each of the two instructions, which were separate, unnumbered paragraphs of instruction No. 2, and which were separately objected to by appellant. The two paragraphs read as follows:

"You are instructed that it was the duty of the defendant to do all within his power, consistent with his safety, to avoid the difficulty with the deceased, and, if you believe from the evidence in this case that the defendant went back to his home for the purpose of having trouble or provoking the difficulty which brought on the

trouble that resulted in the killing, then he cannot claim self-defense, and that plea would be of no avail. There are two contentions with reference to that. The defendant says that he went back there for the purpose of ascertaining the condition of the fire and to protect his property against fire, that was on account of the condition of the fire-place. If that is true, he would have had a lawful right to have gone back there for that purpose, or for any other purpose, or in the absence of any purpose. It being his home, he had a right to return if, on returning, he went there upon lawful mission and means. If he went there for an unlawful purpose, then, before he can plead the law of self-defense, he must have, in good faith, endeavored to withdraw from the difficulty, if one arose, before firing the shot that took the life of his fellow-man. That is true because the law provides that the party killing must have exercised and used all means within his power, consistent with his safety, to avoid the danger and avert the necessity of taking human life.

"You are instructed that, while it is true that the home of the defendant was his castle, and he had a right to protect it, but if you believe he left there voluntarily and then returned, then he could not plead the law of self-defense till he had endeavored honestly and in good faith to withdraw from that difficulty; but you are not to understand, gentlemen of the jury, that the mere fact that the defendant returned to his home imputes to him any negligence or carelessness or unlawful act upon his part. As stated to you, he had an absolute right to return to his home, notwithstanding he had taken his wife away from it, at any time he saw fit, but he wouldn't have a right to return there for an unlawful purpose, but it must be for a lawful purpose. It would be for a lawful purpose if he went there to protect his home against any injuries, either from the deceased in this case or any other cause."

Each of these instructions was, we think, erroneous in declaring the law to be that merely because appellant

"went back to his home for the purpose of having trouble or provoking the difficulty which brought on the trouble that resulted in the killing, then he cannot claim self-defense, and that plea would be of no avail." It is true that the court coupled this declaration with the further statement that appellant had the right to go back to his home, but this did not lessen the harmful effect of telling the jury that, merely because he went back for the purpose of provoking the difficulty, he could not claim self-defense. Appellant did not, under his contract, have exclusive occupancy of the house, but it was his home, and he had the legal right to return to it, regardless of his motives, unless he did some act which provoked the difficulty. Even though it was his home, Tallent also had reserved the right to occupy a part of the premises, and if appellant, by act or conduct, brought on the difficulty at the house which they both rightfully occupied, he could not claim self-defense unless he endeavored in good faith to retire from the difficulty. *Strong* v. *State,* 85 Ark. 536. But these instructions now under consideration in effect declared the law to be that, if appellant went back to the house for the purpose of bringing on a difficulty, whether he did anything or not to bring about the difficulty, he forfeited his right of self-defense, unless he endeavored to retire from the difficulty. This was clearly erroneous, and may have been prejudicial, because the jury might have found that appellant went back to the place expecting to bring on a difficulty with Tallent and kill him on account of the insults offered, but that he did nothing to bring on the difficulty, and merely resisted the threatened assault of Tallent. This part of the instruction, notwithstanding the court's additional statement that appellant had the right to go back to his home, ignored the principle that the house in question was appellant's home, and that he had a right to return to it, regardless of his motives, unless he did some act to bring on a difficulty. The Attorney General contends that the error in these instructions does not call for a reversal, for the reason that there was no specific objec-

tion made. There was, as before stated, a separate
objection made to each of these paragraphs, but further
than that there was no specific objection made. We
think that each of these paragraphs was inherently erro-
neous, and that a specific objection was not necessary in
order to call the court's attention to the error. The
paragraphs were, in effect, separate instructions, and
of course it was necessary to make a separate objection
to each, which was done, for an objection in gross to
instructions is not sufficient to call for a review.

Another of appellant's assignments of error relates
to the modification by the court of instruction No. 6,
which reads as follows:

"You are instructed that defendant had a right to
return to his home after having once left it, and, after
his return, had a right to prevent a forcible entry thereto
by deceased, and if you believe from the evidence that
deceased, after the return of defendant, attempted in
a violent or turbulent manner to enter the room of
defendant, the defendant had a right to withdraw there-
from, the better to protect himself from the attempted
or apparent assault of deceased, and if, in so doing,
defendant honestly believed that it was necessary to
shoot deceased to prevent being killed, or seriously
injured in body, you will acquit defendant."

The court modified the instruction, over appellant's
objection, by adding the following:

"If he reached such conclusion based upon the
actions, demonstration and conduct of the deceased at
the time or just prior to the shooting."

The modification was erroneous in narrowing the
consideration of Tallent's acts and conduct to the time
of the killing in determining whether or not appellant
honestly believed that it was necessary to shoot in his
own defense. The learned judge doubtless had in mind
the principle that the necessity for self-defense must
exist at the time of the killing in order to afford an
excuse for the killing, but this is not the effect of the
language used, for it told the jury, not that the necessity

itself must exist at the time, but that appellant's belief as to the necessity must be based upon "the actions, demonstrations and conduct of the deceased at the time, or just prior to, the shooting." This modification cut off all consideration of the previous conduct of deceased, and this was very material matter for the consideration of the jury, as it showed the persistence of the deceased in continuing his threats on the life of appellant and the chastity of his wife. Appellant was entitled to have the jury consider all of the conduct of deceased, from the time he began his threats against appellant down to the moment of the shooting, in order to determine whether there was a real necessity for self-defense, or whether the appellant honestly believed that such a necessity existed.

There are other assignments, but those discussed are sufficient to call for a reversal of the cause, and we deem it unnecessary to discuss the others.

For the errors indicated the judgment is reversed, and the cause remanded for a new trial.